In the

# United States Court of Appeals

## For the Seventh Circuit

No. 19-1850

JENNIFER BEARDSALL, *et al.*,

*Plaintiffs-Appellants*,

*v.*

CVS PHARMACY, INC., *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:16-cv-06103 — **Joan H. Lefkow**, *Judge*.

ARGUED JANUARY 15, 2020 — DECIDED MARCH 24, 2020

Before BAUER, EASTERBROOK, and HAMILTON, *Circuit Judges*.

HAMILTON, *Circuit Judge*. Plaintiffs brought state consumer deception claims against defendant Fruit of the Earth and its retailer clients. They alleged that defendants' aloe vera products did not contain *any* aloe vera and lacked acemannan, a compound that plaintiffs say is responsible for the plant's

therapeutic qualities. But uncontested facts drawn from discovery showed these allegations to be false: the products were made from aloe vera and contained at least some acemannan.

To stave off summary judgment, plaintiffs changed their theory, claiming that the products were degraded and did not contain *enough* acemannan. Plaintiffs said that it was therefore misleading to call the products aloe vera gel, to represent them as "100% Pure Aloe Vera Gel," and to market them as providing the therapeutic effects associated with aloe vera. Plaintiffs have not, however, presented evidence that some concentration of acemannan is necessary to call a product aloe or to produce a therapeutic effect. Nor have they offered evidence that consumers care at all about acemannan concentration. Whatever theoretical merit these claims might have had on a different record, this record simply does not contain evidence that would allow a reasonable jury to find in favor of plaintiffs. With this dearth of evidence, the district court granted summary judgment in favor of defendants. We affirm.

I.  *Undisputed Facts and Procedural Background*

   A.  *Facts*

Defendant Fruit of the Earth, Inc. manufactures aloe vera gel. It both sells the product under its own brand and produces private-label versions for defendants CVS, Walgreens, Walmart, and Target. At issue in this appeal are the Fruit of the Earth and Walgreens products.

The two aloe vera gels are indisputably made from aloe vera plants, though the raw aloe vera harvested by Fruit of the Earth's suppliers is processed both before and after being delivered to Fruit of the Earth. The suppliers harvest, fillet,

and depulp the aloe vera leaves. The resulting aloe is then pasteurized, filtered with active charcoal to remove color and impurities, treated with preservatives, and dehydrated for shipping. Fruit of the Earth then reconstitutes the dehydrated aloe and adds stabilizers, thickeners, and preservatives to make the final gel product shelf-stable. The parties agree that the products are 98% aloe gel (the reconstituted aloe vera solids) and 2% other ingredients (stabilizers and preservatives).

The only relevant difference between the products is the labeling. Both labels describe the respective products as aloe vera gel. Both also indicate that the products can be used to treat dry, irritated, or sunburned skin. The Fruit of the Earth label calls the product "Aloe Vera 100% Gel" and "100% Pure Aloe Vera Gel." An asterisk after "100% Gel" leads to information on the back of the label: "Plus stabilizers and preservatives to insure [sic] potency and efficacy." Each label contains an ingredient list showing that the product contains aloe juice and various other substances. The two labels are reproduced in the attached appendix.[1]

B. *Procedural History*

Plaintiffs filed state-law consumer deception claims against Fruit of the Earth, CVS, Walgreens, Walmart, and Target alleging that the labeling of the aloe vera gels—manufac-

---

[1] Two distinct Fruit of the Earth labels were presented to the district court: one contained an additional asterisk after "100% Pure Aloe Vera Gel" leading to the same disclaimer as the front. On appeal, plaintiffs have included in their brief a version of the bottle without an asterisk (reproduced in the Appendix). Defendants have included in their brief a version of the bottle with an asterisk. Our decision does not depend on this difference.

tured by Fruit of the Earth and sold under all of the defend-
ants' brands—was misleading. The district court adopted a
bifurcated approach to discovery, allowing fact discovery for
the Fruit of the Earth and Walgreens products to proceed and
staying litigation over the others. The court then set a dead-
line for class certification, *Daubert* motions, and dispositive
motions.

After discovery was complete, plaintiffs moved for class
certification. Fruit of the Earth and Walgreens moved to ex-
clude the testimony of plaintiffs' experts and moved for sum-
mary judgment. The district court denied defendants' motion
to exclude the testimony of Dr. Edwards, plaintiffs' expert
whose testimony focused on the amount of acemannan in de-
fendants' products. The court granted summary judgment in
favor of Fruit of the Earth and Walgreens, finding no evidence
that the aloe gel labels would be likely to deceive a reasonable
consumer. Plaintiffs' motion for class certification and de-
fendants' motion to exclude plaintiffs' damages expert were
denied as moot. The parties then stipulated to the entry of a
final judgment in favor of all defendants, and plaintiffs have
appealed.

## II. *Analysis*

We review a grant of summary judgment *de novo*, taking
the facts in the light most favorable to the non-moving parties.
*Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 761 (7th Cir. 2014).
Summary judgment is appropriate "if the movant shows that
there is no genuine issue of material fact and the movant is
entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a);
see also *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52
(1986) (question on summary judgment is "whether the evi-

dence presents a sufficient disagreement to require submission to a jury"). Though the movant bears the burden of showing that summary judgment is appropriate, the non-moving party "may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; it must go beyond the pleadings and support its contentions with proper documentary evidence." *Warsco v. Preferred Tech. Grp.*, 258 F.3d 557, 563 (7th Cir. 2001); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

A. *Legal Standard*

Plaintiffs have brought claims under fourteen consumer protection statutes spanning twelve different states.[2] These

---

[2] Count I: California Consumer Legal Remedies Act, Cal. Civ. Code § 1750 *et seq.* (against Fruit of the Earth, CVS, Target, and Walgreens); Count II: California False Advertising Law, Cal. Bus. & Prof. Code § 17500 *et seq.* (against Fruit of the Earth, CVS, Target, and Walgreens); Count III: California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.* (against Fruit of the Earth, CVS, Target, and Walgreens); Count IV: Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq.* (against Fruit of the Earth, CVS, and Walgreens); Count V: Illinois Consumer Fraud and Deceptive Practices Act, 815 Ill. Comp. Stat. 505/1 *et seq.* (against Fruit of the Earth, CVS, Walgreens, and Walmart); Count VI: Michigan Consumer Protection Act, Mich. Comp. Laws § 445.901 *et seq.* (against Fruit of the Earth and CVS); Count VII: Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010 *et seq.* (against Fruit of the Earth and CVS); Count VIII: New Hampshire Regulation of Business Practices for Consumer Protection, N.H. Rev. Stat. § 358-A:1 *et seq.* (against CVS); Count IX: New Jersey Consumer Fraud Act, N.J. Stat. § 56:8-1 *et seq.* (against CVS); Count X: N.Y. Gen. Bus. Law § 349 *et seq.* (against Fruit of the Earth, CVS, and Walgreens); Count XI: North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1 *et seq.* (against Fruit of the Earth); Count XII: Ohio Consumer Sales Practices Act, Ohio Rev. Code § 1345.01 *et seq.* (against Fruit of the Earth); Count XIII: Oregon Unlawful Trade Practices Act, Or. Rev. Stat. § 646.605 *et seq.* (against Fruit of the

statutes all require plaintiffs to prove that the relevant labels are likely to deceive reasonable consumers. See, e.g., *Suchanek*, 764 F.3d at 756–57 (applying California, Illinois, New Jersey, and New York law, among others); *Fink v. Time Warner Cable*, 714 F.3d 739, 741 (2d Cir. 2013) (applying California and New York law).

A label is deceptive if it is likely to mislead a reasonable consumer in a material respect, even if it is not literally false. *Suchanek*, 750 F.3d at 762, citing *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008), and *Kraft, Inc. v. FTC*, 970 F.2d 311, 314 (7th Cir. 1992) (applying Federal Trade Commission Act, 15 U.S.C. § 45); see also *Bober v. Glaxo Wellcome PLC*, 246 F.3d 934, 938 (7th Cir. 2001) (applying Illinois law) ("[A] statement is deceptive if it creates a likelihood of deception or has the capacity to deceive."); *Ebner v. Fresh, Inc.*, 838 F.3d 958, 965 (9th Cir. 2016) (applying California law) ("[T]he reasonable consumer standard requires a probability that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled.") (internal quotation marks omitted); *Zlotnick v. Premier Sales Grp., Inc.*, 480 F.3d 1281, 1284 (11th Cir. 2007) (applying Florida Law) ("[D]eception occurs if there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment."). This determination of the likelihood of deception "is an impressionistic one more closely akin to a finding of fact than a conclusion of law." *Suchanek*, 764 F.3d at 762, quoting *Kraft*, 970 F.2d at 317.

---

Earth); Count XIV: Texas Deceptive Trade Practices-Consumer Protection Act, Tex. Bus. & Com. Code § 17.41 *et seq.* (against Fruit of the Earth).

B. *Theories of Deception*

Plaintiffs present three distinct but closely related theories of deception. First, they say it is misleading for defendants to call the products "aloe vera gel" because they have only low concentrations of acemannan. Second, they say the labels are misleading because the products do not provide the therapeutic effects that one would expect from a product marketed as aloe vera gel. And third, they say the Fruit of the Earth label is particularly misleading by referring to the product as "Aloe Vera 100% Gel" and "100% Pure Aloe Vera Gel." We address each theory in turn.

1. *Acemannan Concentration and Aloe Vera Gel*

Plaintiffs argue primarily that defendants' labels are deceptive because the products do not contain enough acemannan to be marketed as "aloe vera gel." Acemannan is a polysaccharide found in aloe vera. No reasonable consumer, plaintiffs argue, would purchase an aloe vera product that contains low concentrations of what plaintiffs maintain is an important therapeutic component.

That might be a viable theory, at least in theory. The problem here is that plaintiffs have not presented any actual evidence that the label is likely to mislead consumers about the nature or quality of the product. Summary judgment is the proverbial "'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). In this case, plaintiffs needed to offer evidence that reasonable consumers were likely to be misled in a material way. *Suchanek*, 750 F.3d at 762; see also *Eli Lilly & Co. v. Arla Foods, Inc.*, 893 F.3d 375,

382 (7th Cir. 2018) (applying Lanham Act: "the plaintiff ordinarily must produce evidence of actual consumer confusion in order to carry its burden to show that the challenged statement has 'the tendency to deceive a substantial segment of its audience'"), quoting *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 819–20 (7th Cir. 1999). Plaintiffs have presented no evidence that acemannan concentration itself is actually salient to consumers. Compare *Suchanek*, 764 F.3d 753–54 (survey evidence showed that consumers had strongly negative association with instant coffee and viewed it as an inferior product); *Kraft*, 970 F.2d at 323 (survey evidence showed that consumers made purchasing decisions based on calcium content of cheese). Nor have plaintiffs presented evidence that some concentration of acemannan is necessary to render the product effective.[3]

Evidence of the acemannan concentration in defendants' products—or of the raw aloe vera used to produce them—is not enough if the evidence does not give us reason to believe that consumers care about acemannan concentration. The aloe sold to Fruit of the Earth contained 1.01% acemannan by dry weight. Plaintiffs' expert testified that fresh aloe—the raw ingredient, not the final product—should contain at least 5% acemannan by dry weight, pointing to a trade organization's standards. Testing on the defendants' final product indicated

---

[3] Acemannan is one of numerous possible active substances in aloe vera and has been shown to promote healing. E.g., I. Iacopetti et al., *Hyaluronic acid, Manuka honey and Acemannan gel: Wound-specific applications for skin lesions*, 129 Res. in Veterinary Sci. 82, 83 (2020). But neither the relative importance of these active substances nor relevant information on concentration is in the record.

correspondingly lower concentrations of acemannan in the final product compared to what the expert expected in an aloe product containing undiluted aloe juice.[4]

Defendants challenge the admissibility of the expert report providing that data, but this evidence makes no difference. Even if the products contained relatively low amounts of acemannan, there is a critical gap in the evidence. Plaintiffs' expert never testified that a product with lower acemannan concentration cannot fairly be described as aloe. He also offered no opinion on the relationship between aloe concentration and efficacy. Indeed, plaintiffs failed in their briefing and at oral argument to point us to *any* scientific evidence, inside or outside the record, regarding the level of acemannan needed to render an aloe vera product effective, whatever that might mean.

The deposition testimony presented by plaintiffs cannot fill this evidentiary gap. Some of the plaintiffs testified that they found the labeling to be misleading, particularly regarding the characterization of the product as "100% Pure Aloe Vera Gel." They said nothing about the acemannan content of the products, however. Rather, they all felt misled because

---

[4] The plaintiffs' expert testified that in undiluted aloe vera products, he would expect to see acemannan concentrations of 200–500 mg/L. Defendants' products measured 45 mg/L and 65 mg/L using the expert's method. Plaintiffs at times refer to the amount of acemannan present as "trace," "infinitesimally small," "barely detectable," and "nonexisten[t]." They also insist that the products "d[o] not actually contain any discernable acemannan." We are willing to assume that these statements were not deliberate misrepresentations by counsel but were unchecked vestiges from an earlier stage in the suit when plaintiffs were claiming incorrectly that the products did not contain any aloe vera. Either way, the irony—coming from plaintiffs claiming deceptive advertising—is not lost on us.

they were incorrectly informed *by their lawyers* that the products contain little or no aloe vera. This was all based on the factually inaccurate theory that plaintiffs later had to abandon.

To survive summary judgment, plaintiffs needed to offer evidence that consumers were materially misled. They did not. As a result, plaintiffs' reliance on *Suchanek*, 764 F.3d 750, *Kraft*, 970 F.2d 311, and *Al Haj v. Pfizer, Inc.*, No. 17 C 6730, 2019 WL 3202807 (N.D. Ill. July 16, 2019), is not only misplaced but illustrates precisely how their evidence is lacking. In each of those cases, unlike this one, at least some extrinsic evidence was offered to show how consumers were likely to be materially misled.

In *Suchanek*, a manufacturer sold coffee pods for use in a Keurig machine. The pods contained instant coffee rather than the high-quality roasted ground coffee beans that consumers expected. 764 F.3d at 752–53. The front of the package claimed that the pods contained "naturally roasted soluble and microground Arabica Coffee" made with high-quality coffee beans. *Id.* at 753. The product, however, was more than 95% instant coffee. The plaintiffs in *Suchanek* offered three surveys showing that consumers expected one product (roasted and ground coffee beans) and received something different that they viewed as inferior (instant coffee). *Id*. at 753–54. We reversed summary judgment because the surveys created a genuine issue of material fact as to whether the defendant's packaging was likely to mislead reasonable consumers. *Id*. at 762.

In *Kraft v. FTC*, we upheld an FTC order finding that Kraft misrepresented the amount of calcium contained in Kraft

cheese singles. 970 F.2d at 313. The relevant advertising campaign told consumers that Kraft singles were more expensive than competing cheese slices because they were made using five ounces of milk instead of cheaper ingredients. *Id*. at 314. While five ounces of milk went into one Kraft single, 30% of the calcium contained in the milk was lost during processing. Kraft's advertisements implied that one Kraft single provided the same amount of calcium as five ounces of milk.

We found substantial evidence supporting the FTC's conclusion that reasonable consumers would be misled about the calcium content of the product. 970 F.2d at 322. We did not require extrinsic evidence of deception, but that was because we credited the expertise of the FTC, and the misleading nature of the challenged claim "was reasonably clear from the face of the advertisement." *Id.* at 319; see also *id.* ("Were this a Lanham Act case, a reviewing court in all likelihood would have relied on extrinsic evidence of consumer perceptions."). But in affirming the FTC's order, we relied on survey data to establish that the deception was material, that is, that consumers placed great importance on calcium consumption and that exaggerated calcium content affected consumers' decisions to buy Kraft singles. *Id*. at 323.

In *Al Haj v. Pfizer, Inc.*, Judge Feinerman denied summary judgment for defendants on a claim that a label for "Maximum Strength" cough syrup was misleading. The plaintiffs offered evidence that, as compared to the "Regular Strength" version, the "Maximum Strength" product contained a similar or lower active ingredient concentration (depending on the ingredient), twice the dosage volume, and therefore half the number of doses per bottle. 2019 WL 3202807, at *2. Pfizer historically charged consumers more for the "Maximum

Strength" version and continued this pricing structure even after it reformulated the medicine to weaken the more expensive "Maximum Strength" version. *Id*. at *1–2. Pfizer's own market research indicated that "quite a few" customers would be willing to spend more money on "Maximum Strength" medicine because they perceived it to work better and to provide more value. *Id*. at *3. And the named plaintiff herself testified that she believed that the more expensive product she purchased would be more effective. The court denied Pfizer's motion for summary judgment because the language "Maximum Strength" invited customers to assume that, when considering the products side-by-side, the more expensive "Maximum Strength" had a greater concentration of maximum ingredients and more potency per volume than "Regular Strength." *Id*. at *5. But the product was less concentrated, less cost-effective, and contained fewer doses.

In *Suchanek*, *Kraft*, and *Al Haj*, the plaintiffs identified precisely how the manufacturers' advertising was misleading and provided evidence that the misrepresentation mattered to consumers. Plaintiffs here, in contrast, have offered no evidence that the products fell short of consumers' expectations in any material way. This is not to say that extrinsic evidence in the form of consumer surveys or market research is *always* needed for a plaintiff to survive summary judgment or judgment as a matter of law on a deceptive advertising claim. See, e.g., *Schering-Plough Healthcare Products, Inc. v. Schwarz Pharma, Inc.*, 586 F.3d 500, 512 (7th Cir. 2009) (under Lanham Act, "a representation may be so obviously misleading that there is no need to gather evidence that anyone was confused"). But such evidence is necessary where the advertising is not clearly misleading on its face and materiality is in doubt.

Despite this absence of evidence, plaintiffs argue that the issue of whether a label is misleading is a question of fact that *must* proceed to a jury. Courts must be careful at summary judgment to view the evidence in the light most favorable to the plaintiff and must send the case to a jury whenever a genuine dispute of material fact exists. See *Suchanek*, 764 F.3d at 762. But granting summary judgment is appropriate if no reasonable jury could find that defendants' labels are likely to mislead reasonable consumers. See *Fink*, 714 F.3d at 741. Plaintiffs here have not gone beyond the pleadings and supported their claims with the necessary evidence. *Warsco*, 258 F.3d at 563.

Plaintiffs also suggest that their burden to produce "evidence of what reasonable consumers believe" the label to mean is "nonsensical." Not so. The burden we invoke here simply reflects the burden of production and persuasion borne by plaintiffs in almost all civil litigation. *Marion v. Radtke*, 641 F.3d 874, 876 (7th Cir. 2011), citing *Director, OWCP v. Greenwich Collieries*, 512 U.S. 267 (1994).

Plaintiffs also say that summary judgment was inappropriate because the lawsuit was in the "class certification phase." We reject this argument. Plaintiffs bear no less of a burden at summary judgment simply because the district court set the same deadline for class certification and summary judgment motions. Where plaintiffs intend to rely on market survey evidence to prove deception, rather than their individual impressions and circumstances, that method of proposed proof may be highly relevant in deciding whether to certify a plaintiff class. To decide only class certification in a consumer deception case, it may not be necessary for the market surveys to be complete and in the record. The issue at

class certification is whether plaintiffs intend to try to prove their case on the merits through evidence common to class members. Whether (later) survey evidence is admissible and probative can be decided on the merits, and of course, a certified class can lose on the merits of its claims. E.g., *Schleicher v. Wendt*, 618 F.3d 679, 685 (7th Cir. 2010). As a response to a motion for summary judgment, however, a promise to come forward with more evidence soon is not sufficient. A party who needs more time for necessary factfinding should file a Rule 56(d) motion. Plaintiffs did not do that here.

### 2. *Therapeutic Efficacy*

Plaintiffs next argue that the defendants' labels are misleading because the products "have little or no therapeutic benefit" due to their lack of acemannan and cannot be used effectively for their stated purposes. We do not know whether that is correct, but the problem is that plaintiffs have presented no evidence that the products at issue are ineffective or that they do not contain enough acemannan to achieve a therapeutic effect.

Facing this dearth of evidence, plaintiffs ask us to shift the burden to the defendants to prove that their products are effective. But in private consumer deception claims, the plaintiff bears the burden of proving the defendant's advertising claim is false or misleading. Private individuals—unlike the Federal Trade Commission—may not bring an action without supporting evidence and merely demand that the defendant prove the claim it makes for its products. Compare *Kwan v. SanMedica Int'l*, 854 F.3d 1088, 1096 (9th Cir. 2017) (under California false advertising law, plaintiffs "do not have the power to require defendants to substantiate their advertising claims"), citing *National Council Against Health Fraud, Inc. v.*

*King Bio Pharmaceuticals, Inc.*, 107 Cal. App. 4th 1336, 1344 (2003), with *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1096 (9th Cir. 1994) (FTC may rely on theory that advertiser lacked reasonable basis for its claims).

   3. *"100% Pure" and Ambiguity*

Plaintiffs' last theory of deception centers on the Fruit of the Earth label's description of the product as "Aloe Vera 100% Gel" and "100% Pure Aloe Vera Gel." As best we can tell, plaintiffs think these phrases are misleading in two ways.

First, plaintiffs say these statements misrepresent the quality of the product by giving consumers the impression that the product is "high quality" or "especially effective" aloe when it is not. But this is just a variant on the argument that the products cannot be called aloe vera gel, and it fails for the same reasons. Plaintiffs have presented no evidence indicating that consumers interpret these as statements of quality. Just as they have presented no evidence showing that some amount of acemannan is needed to call a product aloe vera, they have presented no evidence that some amount of acemannan is needed to call an aloe vera product "100% pure."

Second, plaintiffs suggest that the label is misleading because the product contains preservatives and stabilizers and is therefore not "100% Pure Aloe Vera Gel." Specifically, plaintiffs object to the district court's conclusion that the "100% Gel" and "100% Pure" statements were ambiguous with respect to the presence of stabilizers and preservatives such that the statements could be clarified by the ingredients list. But plaintiffs conceded in their summary judgment brief and deposition testimony that "the presence of preservatives—in reasonably small amounts—was acceptable and

something they *expected*," and that "[n]o [p]laintiff took the label to mean that there was absolutely nothing other than aloe vera in the bottle."[5] The presence of other substances in the product—and the disclosure of those products in the ingredients list—is therefore irrelevant to the theories plaintiffs have chosen to pursue. We are skeptical of defendants' position at oral argument that an asterisk pointing to an ingredient list in fine print could save virtually any deceptive slogan claiming purity. Given plaintiffs' arguments and testimony, though, we need not decide here whether "100% Pure Aloe Vera Gel" is ambiguous with respect to the presence of stabilizers and preservatives.

Along similar lines, plaintiffs say that the district court erred in considering the full ingredient list in determining that the label was not deceptive. They point to a Food and Drug Administration regulation, 21 C.F.R. § 701.1(b), which states that the labeling of a cosmetic "may be misleading" by bearing a "name which includes or suggests the name of one or more but not all such ingredients, even though the names of all such ingredients are stated elsewhere in the labeling." This regulation does not add anything, at least in this case, to the relevant state law. Under the reasonable consumer standard, we look holistically at advertising to determine whether it is misleading, *Toulon v. Continental Casualty Co.*, 877 F.3d 725, 739 (7th Cir. 2017) (applying Illinois law), but disclosure

---

[5] At other times, plaintiffs seem to object to defendants' characterization of the product as "100% Pure" because even though it contains 98% "aloe gel," the aloe gel is only 1% dehydrated aloe solids and 99% water. This measurement reflects only the fact that the product uses rehydrated aloe. Plaintiffs do not suggest that the products are excessively diluted by the rehydration process.

in an ingredient list cannot cure a clearly misleading statement. *Williams v. Gerber Products Co.*, 552 F.3d 934, 939 (9th Cir. 2008) (applying California law). The federal regulation says only that labeling *may* be misleading despite disclosure in an ingredients list. The district court never suggested that the disclosure of the ingredients list necessarily meant that the label could not be misleading.[6]

The judgment of the district court is

AFFIRMED.

---

[6] Because the district court did not err in granting summary judgment, we need not consider defendants' argument that the consumer protection claims fail because they are warranty claims in disguise.

APPENDIX













**Well** at *Walgreens*

WALGREENS PHARMACIST RECOMMENDED‡

### ALCOHOL FREE
# Aloe Vera
**Body Gel**

- Cools & soothes
- Moisturizes dry & sun-damaged skin

**NET WT 16 OZ (453 g)**

Walgreens Aloe Vera Body Gel provides powerful relief for dry, irritated or sunburned skin. This refreshing gel helps skin retain natural moisture to promote healing by forming a protective barrier over injured skin. This nonoily formula absorbs quickly and helps relieve minor burns, insect bites, chafing and itching.

**DIRECTIONS:** Apply liberally to all areas. Gently massage until completely absorbed.

**WARNINGS: FOR EXTERNAL USE ONLY.** Avoid contact with the eyes. If contact with eyes occurs, rinse with water to remove. If irritation or rash develops, stop use and ask a doctor. Keep out of reach of children. If swallowed, seek medical help or contact a Poison Control Center immediately.

**INGREDIENTS:** Aloe Barbadensis Leaf Juice, Aqua (Water), Triethanolamine, Tocopheryl Acetate, Carbomer, Tetrasodium EDTA, DMDM Hydantoin, Diazolidnyl Urea.

‡Walgreens Pharmacist Survey Study, November 2012.

**Questions or comments?**
**1-800-925-4733**

DISTRIBUTED BY: WALGREEN CO.
200 WILMOT RD., DEERFIELD, IL 60015

**100%** SATISFACTION GUARANTEED
walgreens.com  ©2014 Walgreen Co.
MADE IN U.S.A. WITH U.S. AND FOREIGN COMPONENTS
ITEM 375040


0  49022 82298  6

ORG0914