In the

# United States Court of Appeals

## For the Seventh Circuit

No. 20-2235

SCOTT WEAVER,

*Plaintiff-Appellant,*

*v.*

CHAMPION PETFOODS USA INC.
and CHAMPION PETFOODS LP,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 18-cv-1996 — **J. P. Stadtmueller**, *Judge.*

ARGUED APRIL 1, 2021 — DECIDED JUNE 30, 2021

Before MANION, ROVNER, and ST. EVE, *Circuit Judges.*

ST. EVE, *Circuit Judge.* Defendants Champion Petfoods USA Inc. and Champion Petfoods LP (collectively, "Champion") produce dog food that they market as biologically appropriate, containing fresh regional ingredients, and never outsourced. Plaintiff Scott Weaver, a Wisconsin resident who purchased Champion's food, alleged this marketing was deceptive and filed a putative class action. The district court

granted summary judgment to Champion because it determined that Weaver had failed to produce sufficient evidence from which a reasonable jury could determine that any of the representations were false or misleading. We agree, and so we affirm.

## I. Factual Background

Champion produces two different brands of dog food: Acana and Orijen. Before 2016, Champion manufactured its food at its NorthStar kitchen in Morinville, Canada. Starting in 2016, Champion moved most of its manufacturing to its newly opened DogStar kitchen in Auburn, Kentucky.

Weaver lives in Wisconsin and purchased Champion dog food from 2008 until August 2017. He purchased two different varieties of the Orijen brand—Six Fish and Regional Red—for his golden retrievers Jack, Jill, and Prince Harry. Given the timeframe, he purchased food manufactured at both the NorthStar and DogStar kitchens.

### A. Champion's Packaging

Champion's packaging of its Orijen Six Fish and Regional Red food contains various representations about its quality. Champion packages the food produced at the DogStar kitchen differently than the food produced at the NorthStar kitchen. Additionally, the Six Fish variety has different packaging than the Regional Red variety. Across all variations at issue here, however, the packaging describes the food as biologically appropriate, made with fresh regional ingredients, and never outsourced.

Both the Six Fish and Regional Red packaging describe the food as "biologically appropriate." The DogStar packaging for both varieties states that the food is "Biologically

Appropriate—Protein Rich, Carbohydrate Limited." It further states that the food "mirrors the richness, freshness and variety of [Whole Prey] meats that dogs are evolved to eat." The NorthStar packaging states that "[a]ll dogs are evolved as carnivores, designed by Mother Nature to thrive on Whole Prey such as fowl or fish, and possessing a biological need for a diet rich and varied in fresh whole meats supplemented with smaller amounts of fruits, vegetables and grasses."

The packaging also contains various statements about fresh regional ingredients. The DogStar packaging states: "Grown close to home—We focus on local ingredients that are ethically raised by people we know and trust, and delivered to our kitchens fresh or raw each day." The DogStar Six Fish packaging specifies that "New England's vast Atlantic waters" is its "source of inspiration and fresh regional fish" and that it contains "fresh, raw or dehydrated fish ingredients." The DogStar Regional Red packaging similarly states that "America's vast and fertile lands" are its "source of inspiration and fresh regional ingredients" and that it contains "fresh, raw or dehydrated animal ingredients." Both also contain a "meat math" section which specifies that "[t]his 13LB package of Orijen is made with over 11 LB of fresh, raw or dehydrated" fish or animal ingredients. The packaging specifies the 11 pounds were "approximate inclusions" that include "2/3 fresh or raw. 1/3 dried or oils."

The NorthStar packaging similarly includes several references to fresh regional ingredients but does not include the same detailed "meat math" section. The NorthStar Six Fish packaging represents that it "features unmatched inclusions of whole saltwater and freshwater fish—caught wild within our region and delivered to our doors FRESH EACH DAY."

The NorthStar Regional Red packaging similarly states that it "features unmatched inclusions of ranch-raised Black Angus beef, wild boar, lamb, heritage pork and bison—all ranched within our region and delivered FRESH EACH DAY." Both varieties also state that "[o]ur FRESH ingredients are raised in our region by people we know and trust." Both also specify: "Canada's vast and unspoiled lands—our source of inspiration and fresh regional ingredients."

The DogStar packaging states that that the food is "never outsourced" and it is "prepared exclusively in our DogStar kitchens—We don't make foods for other companies and we don't allow our foods to be made by anyone else." The NorthStar packaging provides that "[q]uality is never outsourced" and that "we prepare Orijen ourselves, in our award-winning kitchens."

**B. Champion's Dog Food**

Weaver contends that various aspects of the ingredients and source of Champion's food render its packaging misleading. First, Champion's food is not made solely from fresh ingredients. It contains frozen ingredients and ingredients that were previously frozen. The exact amount of frozen ingredients varies depending on the time of year and the supply available. Champion also uses "regrinds"—previously manufactured food that failed to conform to applicable specifications—as dry filler in some of its dog food. It also sometimes uses "refreshed" ingredients, which are ingredients that Champion cannot use on a given day that are then sent back to the supplier for delivery on a later date. Additionally, even though most of Champion's suppliers only guarantee freshness for 3 to 5 days after delivery, Champion has used ingredients past that window.

Second, Champion does not source all its ingredients from areas close to Morinville, Canada and Auburn, Kentucky. It sources some ingredients internationally, including from Europe, New Zealand, Norway, and Latin America. In addition, it sources some ingredients from locations in North America that are distant from its NorthStar and DogStar kitchens.

Third, Weaver also contends that Champion's packaging is misleading because there is a risk that its food contains Bisphenol A ("BPA") and pentobarbital. BPA is a chemical used primarily to make plastics and resins. Given that plastics and resins are used in food storage containers, humans and animals are regularly exposed to BPA because it can leach from containers into food. They are also exposed to BPA in their environments, as studies have measured levels of BPA in the air, dust, and water. Champion does not add BPA to its food. Laboratory testing, however, revealed that BPA was present in many dog food brands, including some of Champion's brands. Champion submitted unrebutted expert testimony that the levels of BPA purportedly contained in its food according to Weaver's Third Amended Complaint would not cause an adverse effect in a dog.

Pentobarbital is a barbiturate used to euthanize animals. It is an adulterant that dog food should not include. Champion uses beef tallow in some of its food, which is fat rendered from animal carcasses. JBS USA Holdings, Inc. ("JBS") has supplied some of Champion's beef tallow since 2016. Champion's ingredient specification form for beef tallow stated that "[p]roduct shall be from animals deemed fit for human consumption" and "shall not contain animals dead or condemned upon reaching the slaughter facility." Champion did not audit JBS in 2016 or 2017. In March 2018, two lots of beef

tallow that JBS had delivered to Champion were contaminated with pentobarbital. By the time Champion learned about the pentobarbital in May 2018, it already had manufactured 1.7 million pounds of dog food using the affected tallow. It retrieved 1.6 million pounds of the food, but about 100,000 pounds were sold into retail.

## II. Procedural Background

Weaver filed this putative class action in the Eastern District of Wisconsin in December 2018. The district court had original jurisdiction over the action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2)(A) and (C). Weaver's Third Amended Complaint—the operative complaint in this action—contains three claims: (1) violation of the Wisconsin Deceptive Trade Practices Act (the "Act"), Wis. Stat. § 100.18; (2) fraud by omission; and (3) negligence. Weaver submitted reports by two experts, Jon Krosnick and Colin Weir, solely on the issue of damages. Krosnick conducted two surveys, which Weir utilized to calculate the damages allegedly attributable to Champion's misleading representations. On the issue of liability, Weaver did not submit any survey evidence to support his claims. Instead, he only offered his own testimony.

Champion moved for summary judgment and Weaver moved for class certification. While those motions were pending, the district court granted Champion's motion to exclude the opinions of Weaver's damages experts. Champion then renewed its motion for summary judgment, which the district court granted on all counts. Weaver now appeals the district court's exclusion of his damages experts and grant of summary judgment for Champion.

### III. Discussion

#### A. Legal Standard

We review the district court's grant of summary judgment de novo, taking the facts in light most favorable to Weaver as the non-moving party. *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 972 (7th Cir. 2020). "Summary judgment is appropriate 'if the movant shows that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)). As the movant, Champion bears the burden of showing that summary judgment is appropriate. As the non-moving party, however, Weaver "may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; [he] must go beyond the pleadings and support [his] contentions with proper documentary evidence." *Id.* (quoting *Warsco v. Preferred Tech. Grp.*, 258 F.3d 557, 563 (7th Cir. 2001)). "It is well-settled that speculation may not be used to manufacture a genuine issue of fact." *SportFuel, Inc. v. PepsiCo, Inc.*, 932 F.3d 589, 601 (7th Cir. 2019) (quoting *Amadio v. Ford Motor Co.*, 238 F.3d 919, 927 (7th Cir. 2001)).

#### B. Wisconsin Deceptive Trade Practices Act

Weaver contends that Champion's packaging violates the Act because its representations that its food is biologically appropriate, made with fresh regional ingredients, and never outsourced are false or misleading. In Weaver's view, these representations are false or misleading because Champion's food contains or is at risk of containing non-fresh and non-regional ingredients, as well as BPA and pentobarbital. The district court concluded that Weaver had failed to provide

sufficient evidence from which a jury could find that Champion's packaging is misleading to a reasonable consumer.

The Act "generally prohibits false, deceptive, or misleading representations or statements of fact in public advertisements or sales announcements." *Tietsworth v. Harley-Davidson, Inc.*, 677 N.W.2d 233, 244 (Wis. 2004). Claims arising under the Act have three required elements: "(1) the defendant made a representation to the public with the intent to induce an obligation, (2) the representation was untrue, deceptive or misleading, and (3) the representation materially induced (caused) a pecuniary loss to the plaintiff." *Novell v. Migliaccio*, 749 N.W.2d 544, 553 (Wis. 2008) (internal quotation marks and citation omitted). "Silence—an omission to speak—is insufficient to support a claim" under the Act and thus it applies "only [to] affirmative assertions, representations, or statements of fact that are false, deceptive, or misleading." *Tietsworth*, 677 N.W.2d at 245.

Like other state consumer protection statutes, the Act can be violated "even if [the representation] is not literally false." *Beardsall*, 953 F.3d at 973. Rather, "a label is deceptive if it is likely to mislead a reasonable consumer in a material respect." *Id.* The Act thus "may be satisfied by proof that a statement is likely to mislead a reasonable consumer, even if the statement is literally true." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 761–62 (7th Cir. 2014). In *Beardsall*, we recently rejected the argument that "the issue of whether a label is misleading is a question of fact that *must* proceed to a jury." 953 F.3d at 976. Rather, summary judgment is appropriate "if no reasonable jury could find that defendants' labels are likely to mislead reasonable consumers." *Id.* While "extrinsic evidence in the form of consumer surveys or market research is [not]

*always* needed for a plaintiff to survive summary judgment or judgment as a matter of law on a deceptive advertising claim … such evidence is necessary where the advertising is not clearly misleading on its face and materiality is in doubt." *Id.*

### 1. Biologically Appropriate

Weaver argues that Champion's representations on its packaging that its food is "biologically appropriate" are false or misleading because there is a risk that the food contains BPA and pentobarbital.[1] In Weaver's view, calling the food biologically appropriate is a forward-facing message guaranteeing that the food contains only natural ingredients. Because BPA is a chemical and pentobarbital is a barbiturate, Weaver contends that a reasonable consumer would be materially misled.

Regarding BPA, it is undisputed that humans and animals are commonly exposed to BPA, Champion does not add BPA to its food, and the level of BPA purportedly in Champion's food poses no health risks to dogs. Despite these uncontested facts, Weaver insists that the mere risk that *any* small amount of BPA is present in Champion's foods renders its representations that its food is biologically appropriate misleading to a reasonable consumer. In support, Weaver relies solely on his own testimony that he would consider no amount of BPA to be biologically appropriate.

Weaver's argument is unpersuasive because he has failed to provide evidence that the phrase "biologically

---

[1] Like the district court, for the purposes of this appeal we will assume that "biologically appropriate" is an actionable representation under the Act rather than non-actionable commercial puffery.

appropriate" is likely to materially mislead a reasonable consumer into believing that the product was BPA-free. Our decision in *Beardsall* illustrates why this is the case. 953 F.3d at 973. There, consumers who purchased aloe vera gel sued under various consumer protection statutes on the basis that the product was labeled as "100% Pure Aloe Vera Gel" even though it had low concentrations of acemannan (a polysaccharide found in aloe vera). We upheld summary judgment, noting that the plaintiffs' theory "might be viable" but that they "have not presented any actual evidence that the label is likely to mislead consumers about the nature or quality of the product." *Id.* Specifically, "[p]laintiffs ha[d] presented no evidence," such as consumer surveys, to show that "acemannan concentration itself is actually salient to consumers." *Id.* Evidence of the acemannan concentration in the product "does not give us reason to believe that consumers care about acemannan concentration." *Id.* at 974. The plaintiff's expert did not testify that a product with low acemannan concentration could not be called aloe, or that a certain level of acemannan was needed to render aloe effective. *Id.* Unlike in other consumer protection cases that had survived summary judgment, the plaintiffs in *Beardsall* "offered no evidence that the products fell short of consumers' expectations in any material way." *Id.* at 976. The court noted that "[t]his is not to say that extrinsic evidence in the form of consumer surveys or market research is *always* needed for a plaintiff to survive summary judgment … on a deceptive advertising claim," but "such evidence is necessary where the advertising is not clearly misleading on its face and materiality is in doubt." *Id.*

In this case, Weaver only offered his own testimony to prove that a reasonable consumer would interpret "biologically appropriate" as certifying that the food is BPA-free. He

failed to offer any additional evidence to support this ele-
ment. Uncontested evidence in the record shows that the level
of BPA purportedly in Champion's food poses no risk of ad-
verse health effects in dogs. Additionally, it is undisputed that
humans and animals are commonly exposed to BPA and BPA
is found in some other brands of dog foods. Just like the plain-
tiffs in *Beardsall* failed to show that a reasonable consumer
would interpret "100% Pure Aloe Vera Gel" as certifying a
certain concentration of acemannan, Weaver has offered no
evidence that a reasonable consumer here would interpret
"biologically appropriate" as certifying the product was BPA-
free. Weaver further did not offer any evidence that the low
levels of BPA in some of Champion's food renders it biologi-
cally inappropriate. Nor does he offer consumer surveys or
market research showing that a reasonable consumer would
interpret "biologically appropriate" to mean BPA-free. Like
*Beardsall*, this is not a case where the representation that the
food is biologically appropriate is "clearly misleading on its
face," and so Weaver's reliance on his own testimony to over-
come summary judgment is misplaced. 953 F.3d at 976. To
survive summary judgment, Weaver needed to offer evidence
that reasonable consumers were likely to be misled in a mate-
rial way by the phrase "biologically appropriate," and he has
failed to do so.

Weaver's argument that the phrase "biologically appropri-
ate" is misleading because the food contains a risk of pento-
barbital also fails, but for a different reason. As the district
court noted, Weaver lacks standing because he failed to show
that the dog food he purchased was at risk of containing pen-
tobarbital. The sole source of any potential pentobarbital is
JBS, a third-party supplier of tallow. Weaver stopped pur-
chasing Champion's food in August 2017. JBS, however, did

not deliver the contaminated tallow to Champion until March 2018. Despite this undisputed fact, Weaver contends that a reasonable jury could still find that there was a risk that the food he purchased contained pentobarbital. He cites to the fact that even though Champion designated beef tallow as a high-risk ingredient, it failed to audit JBS in 2016 and 2017. Additionally, a JBS sample retained from November 2017 tested positive for pentobarbital.

These facts amount to nothing more than speculation. And a "party must present more than mere speculation or conjecture to defeat a summary judgment motion." *Liu v. T & H Mach., Inc.*, 191 F.3d 790, 796 (7th Cir. 1999). Champion's failure to audit JBS is not sufficient evidence to raise an issue of fact that prior to March 2018 there were contaminated shipments. The retained sample that tested positive for pentobarbital was from November 2017—months after Weaver stopped purchasing Champion's food. Moreover, the sample was from a subsidiary of JBS and Weaver did not offer any evidence that Champion ever received tallow produced at that facility.

Ultimately, even considering these facts together and in the light most favorable to Weaver, he has offered no evidence from which a reasonable jury could infer that he purchased dog food containing pentobarbital. We thus affirm the district court's grant of summary judgment to Champion as to whether the risk of the presence of BPA or pentobarbital rendered the phrase "biologically appropriate" misleading to a reasonable consumer.

### 2. Fresh and Regional Ingredients

Weaver next argues that Champion's representations that its food is made with fresh regional ingredients are misleading. According to Weaver, the representations about fresh ingredients are misleading because Champion uses frozen ingredients, regrinds, refreshed ingredients, and ingredients that are past their expiration date. He further argues the representations about regional ingredients are misleading because some ingredients are sourced from places far away from Morinville and Auburn, where the dog food is manufactured. The district court determined that the packaging was not misleading because it did not represent that *all* the ingredients were fresh and regional. Consequently, because the food contained some ingredients that were fresh and sourced regionally, a reasonable consumer would not be misled.

On appeal, Weaver insists the district court erred. He contends that a reasonable consumer would interpret Champion's claims that they use fresh regional ingredients as meaning that they use *only* fresh regional ingredients. Several district courts have held that references to ingredients used do not imply that ingredient is used exclusively. *See Kennedy v. Mondelez Glob. LLC*, No. 19-cv-302, 2020 WL 4006197, at *4 (E.D.N.Y. July 10, 2020) (noting that graham crackers that were advertised as "made with real honey" were not misleading even though other sweeteners and additives were also used); *Sarr v. BEF Foods, Inc.*, No. 18-cv-6409, 2020 WL 729883, at *4 (E.D.N.Y. Feb. 13, 2020) (determining that a label that states that mashed potatoes are made with "real butter" does not imply that other fats are also not used); *Henderson v. Gruma Corp.*, No. 10-cv-04173, 2011 WL 1362188, at *12 (C.D. Cal. Apr. 11, 2011) (determining that crackers labeled as made

"with Garden Vegetables" was not misleading as a matter of law because "the labeling statement does not claim a specific *amount* of vegetables in the product, but rather speaks to their presence in the product"). Relying on this line of cases, the district court in *Song v. Champion Petfoods USA, Inc.*, No. 18-cv-3205, 2020 WL 7624861 (D. Minn. Dec. 22, 2020), recently dismissed a similar claim against Champion:

> Just as a statement that mashed potatoes are made with "real butter" does not imply that the *only* fat used is real butter, and just as a statement that graham crackers are made with "real honey" does not imply that the *only* sweetener used is real honey, so too the statement that a bag of dog food contains "fresh regional ingredients" does not imply that it is composed *exclusively* of ingredients that are fresh and regional.

*Id.* at *7.

Weaver relies solely on his own testimony that he expected all the ingredients to be fresh and sourced from places close to Morinville and Auburn. This falls short of evidence from which a reasonable jury could find that there is "a probability that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled." *Beardsall*, 953 F.3d at 973 (quoting *Ebner v. Fresh, Inc.*, 838 F.3d 958, 965 (9th Cir. 2016)). Champion's representations that its food is made with fresh regional ingredients are not clearly misleading—its food does, in fact, contain some ingredients that are fresh and sourced regionally. Weaver thus needed to offer something more than his own testimony. *Beardsall*, 953 F.3d at 976 (noting that while "extrinsic evidence in the form of consumer surveys or market research is [not] *always* needed for a plaintiff to survive

summary judgment … on a deceptive advertising claim," such evidence is needed "where the advertising is not clearly misleading on its face …").

Weaver contends that our recent decision in *Bell v. Publix Super Markets, Inc.*, 982 F.3d 468 (7th Cir. 2020), renders summary judgment inappropriate here, but his reliance on *Bell* is misplaced. There, the plaintiffs alleged that they were misled by cheese products labeled as "100% Grated Parmesan Cheese." *Id.* at 474. The district court granted the defendants' motion to dismiss, reasoning that the ingredient label—which included ingredients other than grated parmesan cheese—would cure any ambiguity from the label. *Id.* We reversed, reasoning that the plaintiffs' allegations were plausible because "[w]hat matters most is how real consumers understand and react to the advertising" and "an accurate fine-print list of ingredients does not foreclose as a matter of law a claim that an ambiguous front label deceives reasonable consumers." *Id.* at 476.

Unlike in *Bell*, here Champion's packaging did not represent that it was made with 100% fresh regional ingredients. But more importantly, "[t]he result is different in this case because of the difference between a motion to dismiss on the pleadings and a motion for summary judgment." *Id.* at 482–83 (noting that *Bell* does not conflict with our decision in *Beardsall* to affirm the district court's grant of summary judgment because "the *Beardsall* plaintiffs failed to offer any consumer surveys showing the 100% claim was misleading" and ultimately "failed to offer evidence of actual deception"). In *Bell*, to survive a motion to dismiss, the plaintiffs needed only to "nudge[] their claims across the line from conceivable to plausible" and present "a claim to relief that [was] plausible

on its face." *Id.* at 476 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). We concluded that their complaints—which included allegations that they had conducted consumer surveys showing that consumers were misled by the label—passed the plausibility threshold.

But here, as in *Beardsall*, the question is not whether Weaver's allegations are plausible—instead, the question is whether he has provided sufficient evidence from which a jury could find that a reasonable consumer would be materially misled by Champion's representations that its food is made with fresh regional ingredients. "Summary judgment is the proverbial put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Beardsall*, 953 F.3d at 973 (internal quotation marks and citation omitted). Here, Weaver failed to offer such evidence. We therefore affirm the district court's grant of summary judgment.

### 3. Never Outsourced

Weaver next contends that Champion's representations that its food is "never outsourced" are misleading because it buys ingredients such as meal and tallow from outside sources. Specifically, the DogStar packaging states: "Never outsourced. Prepared exclusively in our DogStar kitchens—We don't make foods for other companies and we don't allow our foods to be made by anyone else." The NorthStar packaging represents that "Quality is never outsourced" and that "we prepare Orijen ourselves, in our award-winning kitchens."

Weaver testified that these representations misled him into believing that Champion sourced its ingredients from

nearby. In other words, Weaver understood that Champion was not growing or raising all the ingredients in its food—rather, it sourced them from somewhere else. Nevertheless, he contends that the fact that Champion sourced certain ingredients like tallow from third parties means that its representations that its food is "never outsourced" are misleading. In support, he again relies solely on his own testimony. Similar to the other alleged misrepresentations, Weaver has fallen short of introducing sufficient evidence from which a jury could find that reasonable consumers were misled. Champion's representations about outsourcing reference that it prepares its food in its own kitchens, and Weaver does not contend that Champion does not do so—instead, he insists that the fact that Champion sources certain ingredients from third parties means that it does, in fact, outsource the preparation of its food. Given that the representations at issue are not misleading on their face when taken in context, to survive summary judgment Weaver must have offered evidence that a reasonable consumer would be materially misled. *See Beardsall*, 953 F.3d at 976. He has not done so.

Weaver cites to our decision in *Suchanek* to argue that whether a reasonable consumer would be misled by Champion's representations should be a question for the jury. But this argument is unavailing. "The plaintiffs in *Suchanek* offered three surveys showing that consumers expected one product (roasted and ground coffee beans) and received something different that they viewed as inferior (instant coffee)." *Beardsall*, 953 F.3d at 975 (citing *Suchanek*, 764 F.3d at 753–54). But here, as in *Beardsall*, the representations are not misleading on their face and Weaver has failed to offer any evidence apart from his own testimony that a reasonable consumer would be materially misled. *See Beardsall*, 953 F.3d at

976 (affirming summary judgment because "[p]laintiffs here have not gone beyond the pleadings and supported their claims with the necessary evidence"). This is not sufficient to create an issue of fact for the jury. We thus affirm the district court's grant of summary judgment on this claim.

## C. Fraud and Negligence Claims

Weaver further argues that the district court erred in granting summary judgment for Champion on his fraud and negligence claims. In his view, the district court impermissibly imposed a literal falsehood standard that Wisconsin law does not require, and Champion had a duty to disclose the "true contents" of its food, including the risk of BPA and pentobarbital.

Weaver's arguments are unpersuasive. Under Wisconsin law, "[a]ll misrepresentation claims share the following required elements: 1) the defendant must have made a representation of fact to the plaintiff; 2) the representation of fact must be false; and 3) the plaintiff must have believed and relied on the misrepresentation to his detriment or damage." *Tietsworth*, 677 N.W.2d at 239. Additionally, intentional misrepresentation claims must show that "4) the defendant must have made the misrepresentation with knowledge that it was false or recklessly without caring whether it was true or false; and 5) the defendant must have made the misrepresentation with intent to deceive and to induce the plaintiff to act on it to his detriment or damage." *Id.* "[S]ilence, a failure to disclose a fact, is not an intentional misrepresentation unless the seller has a duty to disclose." *Id.* (quoting *Ollerman v. O'Rourke Co., Inc.*, 288 N.W.2d 95, 99–100 (1980)). A duty to disclose may arise "where the seller has told a half-truth or has made an ambiguous statement if the seller's intent is to create a false

impression and he does so." *Ollerman*, 288 N.W.2d at 102. If a party has a duty to disclose a fact, "[t]he failure to disclose [that] fact constitutes a misrepresentation." *Hennig v. Ahearn*, 601 N.W.2d 14, 22 (Wis. Ct. App. 1999).

Weaver's fraud and negligence claims therefore fail for the same reason as his claims arising under the Act—he has failed to provide sufficient evidence from which a reasonable jury could find Champion's representations false or misleading. He did not provide evidence that a reasonable consumer would be misled by Champion's representations that its food is biologically appropriate, contains fresh regional ingredients, and is never outsourced.

Furthermore, he has failed to show that Champion had a duty to disclose the risk that its food may contain BPA or pentobarbital. Humans and animals are commonly exposed to BPA in their everyday environments, Champion does not add BPA to its food, and it submitted unrebutted testimony that the levels allegedly present would not be harmful to dogs. "Determining whether there is a legal duty [to disclose] and the scope of that duty presents questions of law that require courts to make policy determinations." *Kaloti Enterprises, Inc. v. Kellogg Sales Co.*, 699 N.W.2d 205, 212 (Wis. 2005). Here, Weaver has failed to provide sufficient evidence that a reasonable consumer would consider the potential presence of low[2]

---

[2] In his reply brief, Weaver argued that the district court erred in dismissing his fraud and negligence claims in part because he "presented ample evidence that the Dog Food has a real risk of not just containing BPA, but containing BPA at higher levels than other dog food product tested." This contention has no merit. First, Weaver has repeatedly insisted throughout the course of this lawsuit that the concentrations of BPA are

and non-harmful levels of BPA to be material or would reasonably expect its disclosure. *See id.* at 213 (noting that a duty to disclose arises where "the fact is material to the transaction" and "the mistaken party would reasonably expect disclosure of the fact"). As for the disclosure of a risk of pentobarbital, Weaver has failed to produce evidence that any of the food he purchased contained pentobarbital.

## IV. Conclusion

Summary judgment is the proverbial "put up or shut up" moment in a lawsuit, and Weaver has failed to offer sufficient evidence to support his claims. Accordingly, we need not reach whether the district court erred in excluding Weaver's damages experts.

AFFIRMED

---

irrelevant and immaterial to his claims. Second, even if relevant, the record does not support Weaver's argument. Weaver cites to an expert report that found that the BPA levels in several of Champion's Acana brand foods exceeded 5 parts per billion. It is undisputed that Weaver never purchased Acana food. None of Champion's Orijen brand food—the food Weaver purchased—that were tested by that expert had detectable BPA levels.